IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OMNI MEDSCI, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-140 (WCB) |
| | ) | |
| WHOOP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT WHOOP, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**


OF COUNSEL:

Brian A. Rosenthal
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

Jaysen S. Chung
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
(415) 393-8200

Frank P. Coté
Nathaniel R. Scharn
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, CA 92612-4412
(949) 451-3800

Audrey Yang
Julia G. Tabat
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue Suite 2100
Dallas, TX 75201-2923
(214) 698-3100

David Brzozowski
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jennifer Ying (#5550)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendant WHOOP, Inc.*


August 5, 2026

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1

II. '868 PATENT ..... 1

A. "voice input signals" ('868 Pat., cl. 7) ..... 4

B. "position information from a location sensor" ('868 Pat., cl. 7) ..... 8

III. '533 FAMILY ..... 10

A. "a light source comprising a driver and a plurality of semiconductor sources" ('455 Pat., cl. 1) ..... 12

B. "one or more biosensors adapted to be placed on the user, wherein one or more physiological parameters are measured, wherein measuring of the one or more physiological parameters comprises a differential measurement, and wherein the one or more physiological parameters comprises a pulse rate monitoring and a blood flow measurement" ('475 Pat., cl. 1) ..... 14

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alloc, Inc. v. ITC*,
342 F.3d 1361 (Fed. Cir. 2003)....6

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
637 F.3d 1324 (Fed. Cir. 2011)....12

*Aventis Pharma S.A. v. Hospira, Inc.*,
743 F. Supp. 2d 305 (D. Del. 2010), *aff'd*, 675 F.3d 1324 (Fed. Cir. 2012)....18

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017)....12, 13

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010)....15

*Centripetal Networks, LLC v. Cisco Sys., Inc.*,
No. 2024-2097, 2026 WL 1162800 (Fed. Cir. Apr. 29, 2026)....14, 15

*F5 Networks, Inc. v. Radware, Inc.*,
No. 17-cv-03166-VC, 2018 WL 6039873 (N.D. Cal. Nov. 19, 2018)....12

*IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc.*,
966 F.3d 1374 (Fed. Cir. 2020)....17

*In re Katz Interactive Call Processing Patent Litig.*,
639 F.3d 1303 (Fed. Cir. 2011)....18

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005)....17

*Kaavo Inc. v. Amazon.com Inc.*,
No. 14-cv-353-LPS-CJB, 2018 WL 3025040 (D. Del. June 18, 2018)....17

*Magnolia Med. Techs., Inc. v. Kurin, Inc.*,
169 F.4th 1094 (Fed. Cir. 2026)....16

*Medrad, Inc. v. MRI Devices Corp.*,
401 F.3d 1313 (Fed. Cir. 2005)....5, 7

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004)....12

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)....5, 7, 8, 9

*Siemens Indus., Inc. v. Westinghouse Air Brake Techs. Corp.*,
No. 16-cv-284-LPS-CJB, 2017 WL 5125760 (D. Del. Nov. 6, 2017) ....................................13

*World Class Tech. Corp. v. Ormco Corp.*,
769 F.3d 1120 (Fed. Cir. 2014)..........................................................................7, 10, 11

# TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| **’868 patent** | U.S. Patent No. 9,055,868 |
| **’533 patent** | U.S. Patent No. 9,651,533 |
| **’304 patent** | U.S. Patent No. 10,874,304 |
| **’455 patent** | U.S. Patent No. 11,160,455 |
| **’790 patent** | U.S. Patent No. 12,193,790 |
| **’475 patent** | U.S. Patent No. 12,268,475 |
| **the ’533 Family** | the ’533, ’304, ’455, ’790, and ’475 patents |
| **Asserted Claims** | Claims 7 and 9 of the ’868 patent<br>Claims 11 and 12 of the ’533 patent<br>Claims 12, 13, and 26 of the ’304 patent<br>Claim 1 of the ’455 patent<br>Claim 7 of the ’790 patent<br>Claims 1, 5, 8, and 11–13 of the ’475 patent |
| **Asserted Patents** | The ’868, ’533, ’304, ’455, ’790, and ’475 patents |
| **IPR** | *Inter Partes* Review |
| **Omni** | Plaintiff Omni MedSci, Inc. |
| **POPR** | Patent Owner Preliminary Response |
| **POR** | Patent Owner Response |
| **POSA** | Person of Ordinary Skill in the Art |
| **PTAB** | Patent Trial and Appeal Board |
| **Samsung** | The group of defendants in *Omni MedSci, Inc. v. Samsung Elecs. Co., Ltd. et al.*, Case No. 2:24-cv-01070 (E.D. Tex.) |
| **Samsung IPRs** | *Samsung Elecs. Co., Ltd. et al. v. Omni MedSci, Inc.*, IPR2025-01249 (P.T.A.B.) (IPR of the ’868 patent)<br>*Samsung Elecs. Co., Ltd. et al. v. Omni MedSci, Inc.*, IPR2025-01250 (P.T.A.B.) (IPR of the ’533 patent)<br>*Samsung Elecs. Co., Ltd. et al. v. Omni MedSci, Inc.*, IPR2025-01251 (P.T.A.B.) (IPR of the ’304 patent)<br>*Samsung Elecs. Co., Ltd. et al. v. Omni MedSci, Inc.*, IPR2025-01252 (P.T.A.B.) (IPR of the ’455 patent)<br>*Samsung Elecs. Co., Ltd. et al. v. Omni MedSci, Inc.*, IPR2025-01253 |

| | |
|---|---|
| | (P.T.A.B.) (IPR of the ’790 patent)<br>*Samsung Elecs. Co., Ltd. et al. v. Omni MedSci, Inc.*, IPR2025-01254 (P.T.A.B.) (IPR of the ’475 patent) |
| **WHOOP** | Defendant WHOOP, Inc. |
| **Mercier Decl.** | Declaration of Patrick Mercier, Ph.D., *Omni MedSci, Inc. v. WHOOP, Inc.* Case No. 25-140-WCB (D. Del. Aug. 5, 2026) |

## TABLE OF APPENDICES/EXHIBITS

| Document | Description |
|---|---|
| **Exhibit No. 1** | U.S. Patent No. 9,055,868 |
| **Exhibit No. 2** | U.S. Patent No. 9,651,533 |
| **Exhibit No. 3** | U.S. Patent No. 10,874,304 |
| **Exhibit No. 4** | U.S. Patent No. 11,160,455 |
| **Exhibit No. 5** | U.S. Patent No. 12,193,790 |
| **Exhibit No. 6** | U.S. Patent No. 12,268,475 |
| **Exhibit No. 7** | Ex. 1, Plaintiff Omni MedSci, Inc.'s Infringement Contentions, *Omni MedSci, Inc. v. WHOOP, Inc.* Case No. 25-140-WCB (D. Del. Dec. 5, 2025) ("'868 Infringement Chart") |
| **Exhibit No. 8** | Paper 13, *Samsung Elecs. Co. Ltd. et al. v. Omni MedSci, Inc.*, IPR2025-01252 (P.T.A.B. Nov. 12, 2025) ("'455 POPR") |
| **Exhibit No. 9** | Paper 24, *Samsung Elecs. Co. Ltd. et al. v. Omni MedSci, Inc.*, IPR2025-01252 (P.T.A.B. May 7, 2026) ("'455 POR") |
| **Exhibit No. 10** | Paper 13, *Samsung Elecs. Co. Ltd. et al. v. Omni MedSci, Inc.*, IPR2025-01254 (P.T.A.B. Nov. 12, 2025) ("'475 POPR") |
| **Exhibit No. 11** | Paper 28, *Samsung Elecs. Co. Ltd. et al. v. Omni MedSci, Inc.*, IPR2025-01254 (P.T.A.B. May 7, 2026) ("'475 POR") |
| **Appendix A** | Full Claim Language for Terms at Issue |

## I. INTRODUCTION

The Asserted Patents fall into two distinct groups. The ’868 patent relates to a system for controlling a medical device (*e.g.*, a scope, laser, imaging device) using voice inputs, while the ’533 Family (which consists of the ’533, ’304, ’455, ’790, and ’475 patents) relates to measurement devices that use conventional optical components (like LEDs and detectors) to detect, process, and store data associated with certain physiological parameters. The parties dispute the meaning of four claim terms, two from the ’868 patent and two from the ’533 Family. For the terms of the ’868 patent at issue, Omni ignores the directive to read the claim language in view of the specification and simply contends the terms should be given their plain and ordinary meaning (or, alternatively, construed contrary to the specification). For the terms of the ’533 Family at issue, Omni’s proposed constructions contradict the positions it has taken in the Patent Office as to the scope of the claims. The Court should therefore adopt WHOOP’s proposed constructions.

## II. ’868 PATENT

The ’868 patent is titled “System and Method for Voice Control of Medical Devices,” and relates “particularly to a system and method for voice control of medical devices.” ’868 Pat., Title, 1:33-35 (identifying the patent’s technical field).

The ’868 patent discloses “medical device control systems” (*see id.*, Figs. 1 and 2) in which voice inputs may control medical devices, “a flow of command signals from a medical professional to a medical device in a medical device control system” (*see id.*, Fig. 4), and “a flow chart illustrating an exemplary method 600 for processing a voice control signal and/or a command signal received by a medical device control system” (*see id.*, Fig. 5). *Id.* at 5:44-10:9, 14:22-17:2. The medical devices “may comprise any device or instrument that a medical professional needs to perform a medical procedure,” including, “for example, a surgical scalpel, a scope, a laser, an imaging device, a microscope.” *Id.* at 5:56-60. The patent discloses design features of a medical

endoscope (*see id.*, Fig. 3) that "may be inserted into a patient's body through an orifice during a medical procedure," "can be controlled through, for example, voice commands," and can be coupled to medical device systems, such as those shown in Figs. 1 and 2. *Id.* at 10:60-11:10; *see generally id.* 10:60-14:21 (Fig. 3 description). The endoscope of Fig. 3 includes a control system "capable of at least partially contributing to the control and/or the manipulation of [an] insertable portion," and the control system "may also include touch-screen," which a medical professional can use to manually control the medical device. *Id.* at 11:13-16, 11:60-67.

For illustrative purposes, an annotated version of Fig. 1 is provided below. In the annotated figure, red identifies the medical device 10 and blue identifies communication device 50.




As shown above, the "medical device control system 100" of Fig. 1 "comprises a communication device 50 that enables a medical professional to manipulate medical device 10 using voice commands, auxiliary input commands, and/or automated commands." *Id.* at 5:44-45, 9:14-17. "In operation, a medical professional can speak voice commands into communication

device 50 for communication to host 70. Host 70 receives voice command signals 57 from communication device 50 and processes those signals using a voice recognition module associated with host 70. Host 70 converts the voice command signals into command/data signals 47 and communicates signals 47 to manipulator 40. Manipulator 40 responds by causing medical device 10 to perform its desired function." *Id*. at 9:22-30. "Voice commands may comprise, for example, a voice to take a photograph of a portion of the patient's body, a voice command to change an image size by zooming in or out, or any other suitable voice command capable of causing medical device 10 to perform its functionality." *Id*. at 9:30-35. According to the '868 patent, "[a]llowing a medical professional to use voice commands and/or automated commands can significantly reduce the manual dexterity, and the resulting strain, imposed on the medical professional during a medical procedure." *Id*. at 9:18-21.

The ’868 patent explains that medical devices “may contain one or more sensors … capable of providing positioning information to a medical professional and/or a controller,” wherein the “sensors may be capable of detecting and/or alerting a medical professional or a controller when medical device 10 is in close proximity to and/or in contact with tissue.” *Id.* at 6:14-31. For example, the annotated copy of Fig. 3 shown at right depicts a medical device—a scope intended to be inserted into a patient’s body—with sensors 442 identified in green. “Sensors 442 may be capable of generating and transmitting, for example, positioning information associated with insertable portion 420” of the medical device. *Id.* at 13:32-40. Such sensors help prevent injuries that “may occur when a medical professional accidentally or mistakenly causes insertable portion 420 to contact tissue associated with the patient, which can cause bruising or damage to the tissue.” *Id.* at 13:27-30.




**A. “voice input signals” (’868 Pat., cl. 7)**

| WHOOP’s Proposal | Omni’s Proposal |
|---|---|
| “signals that enable voice control of a medical device” | Plain and ordinary meaning<br><br>If construed: “signals generated from voice input” |

Claim 7 recites, in relevant part, that the “diagnostic system” comprises a “*control* system” that is “capable of receiving *voice input signals* and manually entered input signals.” ’868 Pat., cl. 7. The claim thus recites a control system capable of receiving at least two different types of

"input signals": "voice input signals" and "manually entered input signals." The "voice input signals" are signals that enable voice control of a medical device.

The patent specification and claims confirm that these recited "voice input signals" enable voice control of a medical device. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (citing *Medrad, Inc. v. MRI Devices Corp*., 401 F.3d 1313, 1319 (Fed. Cir. 2005)). To start, the title is "System and Method for ***Voice Control of Medical Devices***,"[1] and the "Technical Field" section states that "[t]his invention relates generally to medical devices and more particularly to a system and method for *voice control of medical devices*." '868 Pat., 1:33-35. Although claim 7 does not use the term "medical device," it is directed toward a "diagnostic system" that collects data representing "physiological information" to generate a "status of the user." *Id.*, cl. 7. The specification consistently refers to input signals, such as voice input signals, as inputs for controlling a medical device. It explains that the control system includes "a communication device capable of receiving one or more input signals from a user" and processors "operable to convert the one or more input signals into one or more control signals capable of being used to manipulate a medical device." *Id.* at 4:37-47. Discussing Fig. 3, shown at *supra* § II, the specification states that "control modules 412, 414, and 416 operate to receive and process input signals from a medical professional," and "input signals may comprise, for example, voice commands, auxiliary input commands, and/or manual input commands." *Id.* at 11:45-47, 49-51. Dependent claim 11 confirms this understanding. The claim recites in part that the "control logic" of the diagnostic system "includes voice recognition software to process at least a portion of the voice input signals." *Id.*, cl. 11. Thus, input signals are inputs for controlling a medical device. It

---

[1] All emphasis added unless otherwise noted.

therefore follows that a "*voice* input signal" is a voice signal used as an input for controlling a medical device.

Furthermore, the specification's discussion of "voice commands" informs the meaning of the voice input signals inputted into claim 7's control system. The specification shows that voice commands are an input signal—the only voice input signal—received by the medical devices and are used for controlling the medical device. For example, the specification states that the medical device systems "may be capable of receiving voice commands associated with the manipulation of [a] medical device." '868 Pat., 5:47-55; *see also id.*, 7:16-21 ("manipulation commands generated in response to voice commands" in Fig. 1), 7:61-64 ("process voice command signals 57, generate command/data signals 47 in response to the voice command, and communicate the command/data signals 47 to manipulator 40" in Fig. 1), 9:14-38 ("communication device 50 that enables a medical professional to manipulate medical device 10 using voice commands"), 10:32-36 ("medical professional … can remotely manipulate medical device 210 using voice instructions"), 11:5-10 ("medical device 400 can be controlled through, for example, voice commands"), 12:37-40 ("a medical professional can control insertable portion 420 using voice commands"), 14:22-15:13 and 16:15-17:2 (disclosure in Figs. 4 and 5 of receiving voice commands, converting them into voice command signals, and later into command and actuation signals that control the medical device).

Thus, based on the claim language read in view of the specification and the claims, "voice input signals" are those that enable voice control of a medical device—a defining characteristic of the invention. *See Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("entirely permissible and proper to limit the claims" where "the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment").

Omni's proposed construction fails because it contradicts the claim language itself, overlooks the specification, and ignores the defining characteristic of the invention: voice control of a medical device. Omni would construe "voice input signals" as merely "signals generated from voice input." Omni thus seeks to improperly broaden this claim element to sweep in voice input signals that are not contemplated by the specification and are wholly unrelated to the "control system" of the diagnostic system disclosed in claim 7. For example, Omni's construction attempts to read this limitation onto a system that performs optical measurements (the WHOOP device), but relies on the fact that the device WHOOP connects to (*e.g.*, a smart phone) includes a microphone to, for example, make voice calls; but the smartphone does not use voice input signals to control the medical or measuring device.

Omni's proposal also ignores every disclosure in the patent regarding how voice input signals are used, as well as the patent's teaching about what "input signals" are. That interpretation contradicts the claim language on its face and is divorced from every (and not supported by any) example in the specification. Such an approach would contravene Federal Circuit authority and should be rejected. *Phillips*, 415 F.3d at 1313; *Medrad*, 401 F.3d at 1319; *see also World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1124 (Fed. Cir. 2014) (rejecting a construction "unmoored from, rather than aligned with, the description of the invention," where the specification identified the feature's "sole purpose" and the construction "would not serve th[at] stated purpose"). Read as a person of ordinary skill would have read it in view of the specification, "voice input signals" means "signals that enable voice control of a medical device."

### B. "position information from a location sensor" ('868 Pat., cl. 7)

| WHOOP's Proposal | Omni's Proposal |
|---|---|
| "information from a sensor regarding the position of a diagnostic component relative to the user's body" | Plain and ordinary meaning |

As with the preceding term, "position information from a location sensor" must be construed "in the context of the entire patent, including the specification," not by reading the words of the claim "in a vacuum." *Phillips*, 415 F.3d at 1313. Read under this required framework, the term means "information from a sensor regarding the position of a diagnostic component relative to the user's body."

Claim 7 recites a "control system" having, *inter alia*, "circuitry for obtaining position information from a location sensor." Although the claim language does not independently attribute a meaning to "position information" or "location sensor," the specification describes that the position information is information about where the medical device, or at least a portion of the medical device, is located relative to the patient's body. The specification also explains that a location sensor is a sensor associated with the medical device that provides such position information. *See, e.g.,* '868 Pat., 2:19-20, 2:52-53.

The specification consistently equates "position information" or "positioning information" with information regarding a medical device's position and / or proximity relative to the patient's tissue obtained from sensors associated with the medical device. *See, e.g.*, '868 Pat., 6:14-31 (medical device "may comprise one or more sensors coupled to feedback control circuitry that is capable of minimizing collateral tissue damage ... the one or more sensors and the control circuitry capable of providing positioning information to a medical professional and/or a controller"); 11:16-23 ("Control system 435 may be capable of receiving … one or more signals associated with the manipulation of insertable portion 420," including "positioning data"); 13:23-44

("Sensors 442 may be capable of generating and transmitting, for example, positioning information associated with insertable portion 420," including "data associated with insertable portion's 420 proximity to tissue of the patient" and "data indicating that wall tissue of a patient's orifice has been encountered and that device 400 may need to be directed away from that wall to prevent injury to the patient's tissue"); 15:14-28 ("positioning data associated with medical device 570" may be fed back to a system controller). In every instance, the position information concerns the medical device or a portion of the medical device relative to the patient's body.

Omni's "plain and ordinary meaning" proposal fails to address the meaning of the term "in the context of the entire patent, including the specification," and invites improperly reading the words of the claim "in a vacuum." *See Phillips*, 415 F.3d at 1313. Reading the claim language in a manner untethered to the specification is not only improper, but also opens the door to an interpretation that divorces the claim from the patent's disclosure. Moreover, Omni has never explained what it believes the "plain and ordinary" meaning of this phrase is, although it is clearly taking an impermissibly broad reading. The risk of broadly misapplying this term is not abstract, as Omni accuses, for example, a third-party phone or tablet's GPS capabilities as allegedly meeting this element. Ex. 7 at 73. But the specification never refers to the then-well known GPS technology or any other sort of map location technology.

Whatever the terms "position" and "location" might mean in the abstract, the '868 patent's only disclosure of position / location sensing relates to sensing the position of a medical device relative to a patient's body. Omni should not be permitted to hide behind a "plain and ordinary meaning" to advance an interpretation unsupported by and unaligned with every disclosure in the patent regarding "position" information from a sensor. A construction that captures a feature performing none of the term's disclosed purposes is "unmoored from, rather than aligned with, the

description of the invention," and should be rejected. *Ormco*, 769 F.3d at 1124. Here, in the context of the specification, "position information from a location sensor" means "information from a sensor regarding the position of a diagnostic component relative to the user's body."

## III. '533 FAMILY

The '533 Family relates to various applications for non-invasive, optical measurement systems, including wearable devices that measure physiological parameters and are intended for use with a smartphone or tablet. '533 Pat., Abstract; '304 Pat., Abstract; '455 Pat., Abstract; '790 Pat., Abstract; '475 Pat., Abstract. The patents in the '533 Family are related through a long series of continuations (often claiming similar or identical subject matter using different words) and purport to claim priority back to the same provisional applications; while their specifications have significant overlap, they are not identical.

Relevant here, the specifications also describe a "medical measurement device" that performs non-invasive measurements of blood "constituent[s] or analytes" using a light source that emits short-wave infrared (SWIR) light. *E.g.*, '533 Pat., 26:30-27:2; '304 Pat. 22:26-64; '455 Pat., 35:66-36:38; '790 Pat., 35:27-67; '475 Pat., 35:15-52. The medical measurement device can "be part of a personal or body area network that communicates with another device (e.g., smart phone or tablet) that communicates with the cloud," and the cloud "may in turn communicate information with the user, dental or healthcare providers." *E.g.*, '304 Pat., 10:46-51; '533 Pat., 26:30-28:15; '455 Pat., 12:1-6; '475 Pat., 11:32-37. The asserted claims of the '533 Family generally relate to a measurement device that is capable of communicating with a personal device, as depicted below in the exemplary embodiment.




FIG. 31

’455 Pat., Fig. 31.

Although there are slight differences between the asserted claims, they all require: (a) a light source comprising a plurality of semiconductor sources (or, specifically, LEDs) to transmit light to a sample; (b) a detection system, detector(s) or receiver to receive light from the sample; and (c) generating an “output signal” from the information obtained from the sample. *See* Appx. A; *see also* ’533 Pat., cl. 5, 11–12; ’304 Pat., cl. 11–12, 19, 26; ’790 Pat., cl. 7. The asserted claims of the ’533, ’304, and ’455 patents additionally require a personal device, smart phone, or tablet that can receive and process the output signal. *Id.* Other asserted claims recite improving the signal-to-noise ratio by increasing the intensity or pulse rate of the light source. *Id.*

As described in WHOOP’s motion to stay briefing, the ’533 Family has been and is currently subject to review in the PTAB. D.I. 37; D.I. 79; D.I. 97. The asserted claims of the ’533 Family overlap significantly with other related claims that the PTAB has already invalidated. *E.g.*,

D.I. 79-1, 79-2, 79-3, 79-4, 79-5. Statements made by Omni in these proceedings are thus part of the prosecution history and may serve as the basis for prosecution disclaimer. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017). Although the Samsung IPRs are still pending and Omni's statements have not yet been adopted by the PTAB, Omni's statements are relevant to claim construction. *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) ("[A] patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation."); *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011) ("[R]egardless of whether the examiner agreed with [the patentee], its statements still inform the proper construction of the term."); *F5 Networks, Inc. v. Radware, Inc.*, No. 17-cv-03166-VC, 2018 WL 6039873, at *1 (N.D. Cal. Nov. 19, 2018) ("Even if the PTAB may not have expressly adopted [patentee's] interpretation [of the claims during IPR], the public is still entitled to rely on it.").

### A. "a light source comprising a driver and a plurality of semiconductor sources" ('455 Pat., cl. 1)

| WHOOP's Proposal | Omni's Proposal |
|---|---|
| "a light source containing a driver within it" | Plain and ordinary meaning |

WHOOP's proposed construction reflects the patentee's statements about the scope of the claims during PTAB proceedings. "[S]tatements made by a patent owner during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer." *Aylus*, 856 F.3d at 1361. In its responses to Samsung's IPR challenging the '455 patent, Omni stated clearly and unmistakably that the "driver" limitation in claim 1 ("a light source comprising a driver and a plurality of semiconductor sources") requires the driver to be *within* the light source itself. Ex. 8 at 15-24; Ex. 9 at 19-29. Nothing in the specification contradicts Omni's position; in fact, the specification's use of the word "driver" is limited to repeating the claim language ("a light source comprising a driver") and a generic statement that

the invention is compatible with "driver electronics." '455 Pat., Abstract, 8:31-36, 9:12-17, 9:53-57, 33:11-14. Thus, Omni's statements in the Samsung IPR were made to distinguish the claimed "driver" limitation from the prior art and are dispositive of the claim construction question here. *Aylus*, 856 F.3d at 1361.

For example, in the Samsung IPR, Omni argued in its Patent Owner Preliminary Response that the prior art at issue (Lisogurski) "does not disclose that drive circuitry 120 (the alleged 'driver') is included *in light source* 130 (the alleged 'light source') *as required in claim 1*." Ex. 8 at 16; *see also Siemens Indus., Inc. v. Westinghouse Air Brake Techs. Corp.*, No. 16-cv-284-LPS-CJB, 2017 WL 5125760, at *8 (D. Del. Nov. 6, 2017) (statement during IPR that certain elements were "inherently required" by the claims amounted to clear and unmistakable disclaimer of claim scope). To illustrate its argument, Omni included the following illustration of Lisogurski's Figure 1:




FIG. 1

Ex. 8 at 17. Omni contended Lisogurski did not teach placing the light drive circuitry (shown in blue) "*within* light source 130" (shown in red), and that Samsung's proposed modification of

Lisogurski failed because it simply moved the light drive circuitry within a probe or sensor (shown in purple) but "*not specifically within a light source*." Ex. 8 at 19-20; *id.*, at 23 ("Even accepting Petitioners' alleged motivation as true, it shows a POSA would at most relocate drive circuitry 120 to sensor 102, not light source 130."). Omni even distinguished the prior Apple IPR of the '533 patent on the basis that, there, the PTAB held a POSA would have been motivated to modify Lisogurski to "relocate drive circuitry 120 to within sensor 102, but ***not*** within light source 130." Ex. 8 at 20 (emphasis in original). Omni repeated these positions in its Patent Owner Response. Ex. 9 at 19-29.

Thus, Omni clearly and unmistakably argued in the '455 IPR that the driver limitation requires the driver to be *within* the light source itself, and that this is distinct from being located generally within the probe or sensor where the light source is located. *Centripetal Networks, LLC v. Cisco Sys., Inc.*, No. 2024-2097, 2026 WL 1162800, at *6 (Fed. Cir. Apr. 29, 2026) (patent owner's statements distinguishing the prior art "define[d] the scope of the asserted claims"). WHOOP's construction, which requires "a light source containing a driver within it," therefore accurately reflects this requirement and should be adopted.

**B. "one or more biosensors adapted to be placed on the user, wherein one or more physiological parameters are measured, wherein measuring of the one or more physiological parameters comprises a differential measurement, and wherein the one or more physiological parameters comprises a pulse rate monitoring and a blood flow measurement" ('475 Pat., cl. 1)[2]**

| WHOOP's Proposal | Omni's Proposal |
|---|---|
| Indefinite | Not indefinite |

[2] Claim 5 of the '475 patent depends on claim 1 and adds: "wherein the apparatus further comprises a processor configured to be coupled to a non-transitory computer readable medium, and wherein the apparatus including the processor is configured to use artificial intelligence in making decisions associated with at least a portion of the output signal." *Id.*, cl. 5. This limitation fails to solve the indefiniteness problems with claim 1, so claim 5 is also indefinite. Mercier Decl. ¶ 55.

This "biosensor" limitation is indefinite for two independent reasons. *First*, based on the claim language and Omni's own statements in PTAB proceedings, a biosensor cannot include the very things that a POSA would expect to be included, and a POSA would be left without any clue as to what is actually included. *Second*, the "biosensor" limitation at issue mixes both structural and functional language making it unclear whether the claim is met by an apparatus capable of performing the claimed measurements or whether the claims require the apparatus to actually perform the claimed measurements.

**1. A POSA reading the claim language in view of the specification would not be able to determine with reasonable certainty what a "biosensor" is.**

Claim 1 of the '475 patent recites several discrete components of the claimed "apparatus adapted to be worn by a user": (a) "one or more biosensors adapted to be placed on the user"; (b) "a light source comprising a plurality of light emitting diodes"; and (c) "a detection system … compris[ing] a plurality of detectors." The presumption, therefore, is that these claim elements require separate, structural components. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010). The specification supports this presumption, stating that the apparatus comprises "one or more biosensors, *as well as* a light source … and a detection system." '475 Pat., Abstract; *see also id.*, 8:39-57 ("The apparatus comprises one or more biosensors …. The apparatus *also* comprises a light source … [and] *further* comprises a detection system.").

Omni agrees that the *Becton* presumption applies; in the Samsung '475 IPR, Omni's POPR and POR distinguished the prior art on the basis that it did not teach a biosensor as an element separate from the light source or detection system. Ex. 10 at 14-15 (Omni arguing that "one or more biosensors," "a light source," and "a detection system" are "separate and distinct claim elements," and that Samsung "improperly rel[ied] on the same prior art components" for these

distinct elements); Ex. 11 at 18-19 (similar) (citing *Magnolia Med. Techs., Inc. v. Kurin, Inc.*, 169 F.4th 1094, 1102-04 (Fed. Cir. 2026)). Thus, there is no dispute that claim 1 requires a biosensor to be a separate component from the light source and detection system.

The problem, however, is that with the light source and light detection systems ruled out, a POSA would not have understood with reasonable certainty what a biosensor is, or how a biosensor is different from the light source and light detection system. That is, a POSA would have understood a "biosensor" to be a context-specific term that does not connote a particular structure but, instead, requires looking at the context in which it is used (here, the claim language and specification) to understand the term. Mercier Decl. ¶ 48. The claim language requires that the "biosensor" is "placed on the user" and suggests—although it is not clear, as described below—that the biosensor measures "one or more physiological parameters," including a "pulse rate monitoring" and a "blood flow," using a "differential measurement." '475 Pat., cl. 1. The specification, too, describes a biosensor by its function, stating that it is part of the measurement apparatus that is "applied to the patient" and "non-invasively" measures "blood constituent[s] or analytes." *Id.*, 35:13-20; Mercier Decl. ¶¶ 49-50.

Yet, the only structures that a POSA reading the patent would have understood could perform the functions attributed to the "biosensor" in claim 1 are the "detection system" or the "detection system" in combination with the light source. *E.g.*, '475 Pat., 3:18-51 (describing "non-invasive monitoring of blood constituents or blood analytes" using "brighter light sources"); 7:43-8:13 (describing "[o]ptical methods of imaging and spectroscopy" for monitoring "lipid, collagen, water, blood, and other structural proteins" using a "light source" and a "detection system" (*e.g.*, "photo-detectors")); 20:7-17 (stating that "this disclosure" covers "non-invasive measurement of blood constituents" using "SWIR optical techniques"); Mercier Decl. ¶ 51. The specification

describes no other "biosensor" structure that a POSA would have understood could perform these functions. Mercier Decl. ¶ 53.

Because a "biosensor" cannot refer to either or both of the light source and the detection system and because the specification provides no additional guidance as to how to understand the definition of a "biosensor," it is indefinite. *IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc.*, 966 F.3d 1374, 1381 (Fed. Cir. 2020) (holding the term "half-liquid" indefinite where the evidence showed it was "not a well-known term in the art" and the specification failed to provide clear boundaries); *Kaavo Inc. v. Amazon.com Inc.*, No. 14-cv-353-LPS-CJB, 2018 WL 3025040, at *3 (D. Del. June 18, 2018) (holding term indefinite where it had "no plain and ordinary meaning in the relevant art" and the specification provided "insufficient guidance to allow a POSA to assess" what the term "covered").

**2. The "biosensor" limitation improperly mixes structural and functional language.**

In addition, the "biosensor" limitation at issue mixes both structural and functional language making it "unclear whether infringement [] occurs," *i.e.*, whether meeting the limitation requires (1) measuring the physiological parameters and monitoring the pulse rate, or (2) a system that is merely capable of performing those functions. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383-84 (Fed. Cir. 2005). Specifically, claim 1's mixed use of structural and functional language leaves the scope of infringement uncertain. *IPXL*, 430 F.3d at 1383-84. Claim 1 is not a method claim; it is directed to an "apparatus comprising one or more biosensors adapted to be placed on the user." '475 Pat., cl. 1. Yet, the remainder of the "biosensor" limitation adds "wherein one or more physiological parameters *are measured*, wherein *measuring* of the one or more physiological parameters comprises a differential measurement, and wherein the one or more physiological parameters comprises a pulse rate monitoring and a blood flow measurement." *Id.*

The emphasized terms are functional steps that use active verbs, but are written in passive tense. The claim therefore requires that actions must be performed in order for the apparatus to infringe—the physiological parameters must be "measured" to be within the scope of the claim—but fails to link these actions to a particular structure. Under such circumstances, the claim cannot be understood to require merely the "capability" of performing the functional limitations.

Thus, although claim 1 is ostensibly an *apparatus* claim, it—like a method claim—requires the performance of specific functional limitations, including performing the measurement of physiological parameters like pulse rate monitoring with a differential measurement. Because it therefore is not clear whether infringement is satisfied by an apparatus capable of performing the claimed measurements or whether the claims require the apparatus to actually perform the claimed differential measurements, the "biosensors" limitation is indefinite. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) (holding claims indefinite that used "wherein" clauses to introduce functional limitations); *Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 330-31 (D. Del. 2010), *aff'd*, 675 F.3d 1324 (Fed. Cir. 2012) (holding product claims indefinite where they recited "whereby [the product] forms or is used to form" a solution because it was not clear "at what point during these [formation] processes the infringement is complete").

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendant WHOOP, Inc.*

OF COUNSEL:

Brian A. Rosenthal
Hyunjong Ryan Jin
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

Jaysen S. Chung
Yana Nebuchina
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
(415) 393-8200

Frank P. Coté
Nathaniel R. Scharn
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, CA 92612-4412
(949) 451-3800

Audrey Yang
Julia G. Tabat
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue Suite 2100
Dallas, TX 75201-2923
(214) 698-3100

David Brzozowski
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500

August 5, 2026

**WORD COUNT CERTIFICATION**

The undersigned counsel hereby certifies that the foregoing document contains 4,981 words, which were counted by using the word count feature in Microsoft Word, in 12-point Times New Roman font. The word count includes only the body of the document. The word count does not include the cover page, table of contents, or the counsel blocks.

*/s/ Jennifer Ying*

Jennifer Ying (#5550).

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on August 5, 2026, upon the following in the manner indicated:

Stephen B. Brauerman, Esquire — *VIA ELECTRONIC MAIL*
Ronald P. Golden, III, Esquire
Emily L. Skaug, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
P.O. Box 25130
Wilmington, DE 19899
*Attorneys for Plaintiff*

Daniel S. Stringfield, Esquire — *VIA ELECTRONIC MAIL*
Timothy P. Maloney, Esquire
Dragan Gjorgiev, Esquire
Peter Krusiewicz, Esquire
Karl Fink, Esquire
NIXON PEABODY LLP
70 West Madison, Suite 5200
Chicago, IL 60602
*Attorneys for Plaintiff*

Elizabeth M. Chiaviello, Esquire — *VIA ELECTRONIC MAIL*
Hang Zheng, Esquire
NIXON PEABODY LLP
799 9th Street NW, Suite 500
Washington, D.C. 20001
*Attorneys for Plaintiff*

William E. Davis, III, Esquire — *VIA ELECTRONIC MAIL*
Ty Wilson, Esquire
DAVIS FIRM PC
213 N. Fredonia Street, Suite 230
Longview, TX 75601
*Attorneys for Plaintiff*

Taylor Pfeifer, Esquire
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
*Attorneys for Plaintiff*

*VIA ELECTRONIC MAIL*

*/s/ Jennifer Ying*

Jennifer Ying (#5550)