**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| OMNI MEDSCI, INC., | § | |
| *Plaintiff,* | § | |
| v. | § | Civil Action No. 25-140 (WCB) |
| WHOOP, INC., | § | |
| *Defendant.* | § | |

**CLAIM CONSTRUCTION ORDER**

In this patent infringement case, plaintiff Omni Medsci, Inc., has asserted seven patents against defendant WHOOP, Inc.: United States Patent Nos. 9,055,868 ("the '868 patent"), 9,651,533 ("the '533 patent"), 10,517,484 ("the '484 patent"), 10,874,304 ("the '304 patent"), 11,160,455 ("the '455 patent"), 12,193,790 ("the '790 patent"), and 12,268,475 ("the '475 patent"). D.I. 11. The patents are directed to medical diagnostic systems that use optical devices to measure a patient's physiological conditions.

## I. Disputed Terms

The parties have reached agreement on the construction of all but four terms or phrases across the asserted patents. D.I. 132 at 1-2. The remaining disputes are these: In the '868 patent, the parties disagree about the proper construction of the terms "voice input signals" and "position information from a location sensor." *See* '868 patent, claim 7. In the '455 patent, the parties disagree about the proper construction of the phrase "a light source comprising a driver and a plurality of semiconductor sources." *See* '455 patent, claims 1, 8, and 15. And in the '475 patent, WHOOP contends that the term "biosensors," as used in claim 1 of the patent is indefinite for two

reasons: first, because of the relationship between that term and other limitations in the claim; and second because the term is used in a manner that impermissibly mixes structural and functional language.

**A. "Voice input signals"**

The '868 patent is titled "System and Method for Voice Control of Medical Devices." The patent is directed in part to voice control of medical diagnostic equipment such as optical systems designed to measure a patient's physiological conditions. An element common to all the claims of the '868 patent is that the diagnostic system is "capable of operating as a control system adapted to receive, store and process at least a portion of the physiological information" associated with the patient, wherein the control system is "capable of receiving voice input signals and manually entered input signals." '868 patent, col. 23, line 61, through col. 24, line 2 (independent claim 1); *id.* at col. 24, ll. 49–58 (independent claim 5); and *id.* at col. 26, ll. 5–15 (independent claim 15).

The parties disagree about the meaning of the term "voice input signals" in the '868 patent. Omni argues that the term "voice input signals" should be given its plain and ordinary meaning.[1]

[1] The use of "plain and ordinary meaning" to construe contested patent terms can be problematic. If one party proposes a specific construction for a claim term, but the other party objects to that construction and proposes that the claim term be given its "plain and ordinary meaning," it is clear that there is a dispute regarding the proper construction of the term in question, but it is not clear what the second party believes the "plain and ordinary meaning" really means. Adopting "plain and ordinary meaning" in such a setting merely puts off resolving the dispute between the parties until a later stage of the proceedings, after each party has relied on its proposed construction in framing the presentation of its case. As a result, the court's ruling may come at a time when it is difficult for the parties to adjust to the court's construction. In the alternative, if the court simply instructs the jury that the term in question should be given its plain and ordinary meaning, and the court allows the parties to present two different versions of the term's plain and ordinary meaning to the jury, the court has in effect abandoned its obligation under *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), to construe disputed terms. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360–63 (Fed. Cir. 2008). In that setting it can also be unclear what construction the jury has adopted, which impairs later review of the verdict. For those reasons, I typically disfavor the use of "plain and ordinary meaning" in resolving claim construction disputes.

Omni offers "signals generated from voice input" as a fallback definition of that term. Pointing to the specification, WHOOP proposes that the term "voice input signals" should be more narrowly construed to mean "signals that enable voice control of a medical device."

The term "voice input signals" is found throughout both the specification and the claims of the '868 patent, often in juxtaposition with the term "manually entered input signals." *See* '868 patent at col. 1, ll. 62–63; col. 2, lines 24 and 57; and claims 1, 7, and 15. The way in which the two terms are used together indicates that the terms "voice input signals" and "manually entered input signals" are alternative means by which a system operator can input directions relating to the functions assigned to the control system, which is "adapted to receive, store, and process" signals, including inputting commands into the system. *See* '868 patent, col. 23, line 67, through col. 24, line 2 (claim 1); col. 24, ll. 56–59 (claim 7); col. 26, ll. 12–16 (claim 15); col. 1, line 53, through col. 2, line 4; col. 2, ll. 25–33; and col. 8, ll. 8–16; *see also id.* at col. 14, ll. 40-42 (describing the "voice recognition module [as being] capable of at least partially contributing to one or more functions of [the] system controller").

The specification explains that the system controller is "capable of processing, collecting, storing, retrieving, and/or amending medical data and/or video during a medical procedure," *id.* at col. 7, ll. 39–42, and that the system controller "may implement voice recognition software operable to process voice command signals," *id.* at col. 7, ll. 49–51. The "host," of which the system controller is a part, can manipulate the medical device, but it is also "capable of collecting, entering, processing, storing, retrieving, amending, and/or dispatching medical data during a medical procedure." *Id.*, col. 7, ll. 23–28.

Although WHOOP correctly notes that the overall objective of the patent is the indirect control of medical devices, the evidence shows that vocal input signals can execute tasks other

than simply controlling the medical devices in their performance of diagnostic functions. Accordingly, the "voice input signals" referred to in claims 1 and 7 of the '868 patent are not limited to signals that control the medical devices referred to in the claims. For that reason, I construe the term "voice input signals" to mean "voice signals to a processor that control the medical devices and direct other functions performed by the diagnostic system."

**B. "Position information from a location sensor"**

Claim 7 of the '868 patent recites that the claimed diagnostic system comprises a software application that is

> capable of operating on a control system adapted to receive, store and process at least a portion of the [patient's] physiological information, the control system having a touch-screen, circuity for obtaining position information from a location sensor, and a wireless transceiver to transmit wireless data over a wireless link, the wireless data comprising at least a part of the physiological information . . . .

'868 patent, col. 24, ll. 49–56.

WHOOP argues that the court should construe the term "position information from a location sensor" in claim 7 to mean "information from a sensor regarding the position of a diagnostic component relative to the user's body." D.I. 114 at 8. Omni responds that WHOOP's proposed construction is too restrictive; instead, Omni urges the court to adopt the "plain and ordinary meaning" of the term "position information from a location sensor," which Omni asserts is not limited to a sensor that detects the location of the medical device with respect to the tissue being treated. D.I. 129 at 2.

Although the '868 patent does not provide a limiting definition of the term "location sensor," the claims and the specification make it clear that the role of the "location sensor" is to obtain "position information." *See* '868 patent, claims 7, 12, 15, and 20; col. 2, ll. 19–20, 51–53. The specification further explains that the "location sensor" can serve as a "proximity sensor,"

which detects the location of the diagnostic device vis-à-vis the tissue that is the subject of study, so as to minimize collateral tissue damage during a medical procedure. *See id.* at col. 1, ll. 58–59; col. 6, ll. 14–20.

The portion of the specification that discusses Figure 4 of the ’868 patent provides a detailed account of how the location sensors can serve as proximity sensors to avoid or minimize damage to a patient’s tissue resulting from contact between the device and the tissue. The specification describes that function as follows:

> Injury may occur when a medical professional accidentally or mistakenly causes insertable portion [of the medical device] **420** to contact tissue associated with the patient, which can cause bruising or damage to the tissue. . . . Sensors **442** may be capable of generating and transmitting, for example, positioning information associated with the insertable portion **420** . . . . In one particular embodiment, sensors **442** are capable of generating and transmitting data associated with the insertable portion’s **420** proximity to tissue of the patient.

*Id.* at col. 13, ll. 27–40.

Claim 7 of the ’868 patent recites in part a “software application capable of operating on a control system adapted to receive, store and process at least a portion of the physiological information, the control system having a touch-screen, [and] circuitry for obtaining position information from a location sensor . . . .” *Id.* at col. 24, ll. 49–53. Claim 13, which depends from claim 7, addresses the control system and recites that it “is further coupled to a proximity sensor.” *Id.* at col. 25, ll. 25–26. In light of the specification, claims 7 and 13 in conjunction are best understood to mean that a location sensor can be employed for obtaining position information generally (as claimed in claim 7) and can be employed in one embodiment as a proximity sensor, providing proximity information (as claimed in claim 13) such as the proximity of the medical device to the patient’s tissue. Neither the specification nor the claims identify any other specific purpose served by the location sensor, the proximity sensor, or the position information in the

claimed system other than detecting proximity to a patient's tissue. However, the principle of claim differentiation indicates that the "circuitry for obtaining position information from a location sensor," as recited in claim 7, is not limited to structure in which the circuitry for obtaining position information from a location sensor is "coupled to a proximity sensor," as required by claim 13. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1324–25 (Fed. Cir. 2005) (en banc). Accordingly, consistent with the claim language, as interpreted in light of the specification, I construe the phrase "position information from a location sensor" in claims 7 and 15 of the '868 patent to mean position information from a location sensor that includes, but is not limited to, information relating to the position of a medical device relative to the patient's tissue.

**C. "A light source comprising a driver and a plurality of semiconductor sources"**

WHOOP's remaining claim construction arguments are addressed to two patents from the '533 family, which consists of the '533 patent, the '304 patent, the '455 patent, the '790 patent, and the '475 patent. Those patents are all addressed to non-invasive optical measurement systems including wearable devices that measure certain of a patient's physiological conditions. The two patents on which WHOOP focuses for claim construction purposes are the '455 patent and the '475 patent.

Claim 1 of the '455 patent recites, in pertinent part, as follows:

> 1. A system for measuring one or more physiological parameters and for use with a smart phone or tablet, the system comprising:
>
> a wearable device adapted to be placed on teeth, a wrist, or an ear of a user, and including a light source comprising a driver and a plurality of semiconductor sources, the plurality of semiconductor sources configured to generate an output [of] optical light having a plurality of optical wavelengths.

'455 patent, col. 86, ll. 42–50.

WHOOP proposes that the term "a light source comprising a driver and a plurality of semiconductor sources" be construed to mean "a light source containing a driver within it." Omni proposes that the term be given its plain and ordinary meaning.

WHOOP bases its proposed construction on the position Omni took with regard to that limitation in an *inter partes* review ("IPR") proceeding that was instituted by Samsung Electronics Co., LLC, and others. IPR2025-01252. During the IPR, Omni distinguished the '455 patent from a prior art patent to Lisogurski, U.S. Patent No. 9,241,676, by arguing that Lisogurski does not disclose or render obvious the driver limitation of claim 1 of the '868 patent. Omni argued that while claim 1 recites a light source comprising a driver, Lisogurski "does not disclose that driver circuitry . . . is included in [the] light source . . . as required by claim 1." D.I. 123-9 at 26 (Exhibit 9 at 16). Omni's position in the IPR proceeding was that Lisogurski did not render claim 1 of the '868 patent obvious because there would have been no motivation to modify Lisogurski to include the driver circuitry within the light source.

Statements made by a patentee in an IPR proceeding can form the basis for limiting the scope of claims raised by that party in subsequent litigation. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353 (Fed. Cir. 2017). In the IPR proceeding, Omni responded to the argument that the '868 patent would have been obvious in light of Lisogurski by arguing that a person of ordinary skill in the art would not have been motivated to combine the driver circuitry with the overall "sensor" such that the sensor would contain both the light emitting and light detecting functions. D.I. 123-9 at 28, 30, 32, 33–34 (Exhibit 9 at 18, 20, 22, 23-24).

Omni characterizes its argument before the PTAB as distinguishing Lisogurski from the '455 patent without narrowing the scope of its own claims. While it is true that Omni argued that there would be no motivation to modify Lisogurski in the manner suggested by the IPR petitioners

because of the heat generated by the light sources and the potential thermal effects on the driver circuitry, the main thrust of Omni's argument was textual. In the Patent Owner's Preliminary Response ("POPR"), Omni led with textual arguments. Omni bolded and italicized the words "comprising" and "comprises," and it used the word "included" synonymously with "comprised." D.I. 1232-9 at 25–26 (Exhibit 9 at 15–16). Most importantly, Omni distinguished Lisogurski's system, in which the driving circuitry is found within a larger "sensor" apparatus (containing both the components for emitting and detecting light), from a system in which the driving circuitry is located within the "light source" itself. D.I. 123-9 at 25–28 (Exhibit 9 at 15–18). Omni characterized Lisogurski, in which the drive circuitry was located within a probe as opposed to within the light source itself, and contrasted that system with the system recited in Omni's claims, the clear implication of which was that Omni locates its driving circuitry within the light source.

Omni thus made clear that its claims are directed to a light source that contains both the emitting elements and the driving circuitry for those elements within that source. Omni's repeated and direct statements in the IPR proceeding that the driver in the '868 patent is located within the light source constitute prosecution disclaimer, foreclosing Omni from taking a contrary position in this litigation. *See Aylus*, 856 F.3d at 1360-62; *see also Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1327 (Fed. Cir. 2023).

Omni points out in passing that WHOOP's proposed construction fails to account for the "semiconductor sources" limitation in Omni's claims. In order to account for that limitation, I construe the contested claim language as follows: "a light source containing a driver within it, and a plurality of semiconductor sources." That construction incorporates the limiting effect of Omni's arguments in the IPR proceeding, while remaining faithful to the original claim language.

## II. Indefiniteness: "Biosensors"

WHOOP next argues that claims 1 and 5 of the '475 patent are indefinite because of the use of the term "biosensors" in the claims. Indefiniteness is assessed from the perspective of a person of ordinary skill in the art at the time of the patent application. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910–11 (2014). In this case, the parties agree that a person of ordinary skill in the relevant art is a person with a bachelor's degree in engineering and some further experience in either industry or academia. D.I. 115 at 7-8, D.I. 123-7 at 10-11. An issued patent enjoys a presumption of validity, and a party arguing indefiniteness must prove the claim indefinite by clear and convincing evidence. *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011); *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

WHOOP makes two arguments regarding indefiniteness. First, WHOOP argues that a person of ordinary skill in the art would be unable to discern the meaning of the term "biosensors" as used in the '475 patent. D.I. 114 at 15–17. Second, WHOOP argues that the "biosensors" limitation is indefinite because the claim improperly mixes structural and functional features. *Id.* at 17–18.

### A. The Meaning of "Biosensors"

Claim 1 of the '475 patent recites as follows, in pertinent part:

> 1. An apparatus adapted to be worn by a user comprising: one or more biosensors adapted to be placed on the user,
>
> wherein one or more physiological parameters are measured,
>
> wherein measuring of the one or more physiological parameters comprises a differential measurement, and wherein the one or more physiological parameters comprises a pulse rate monitoring and a blood flow measurement.
>
> a light source comprising a plurality of light emitting diodes that are configured to generate an output optical light having one or more optical wavelengths;
>
> . . . .
>
> a detection system configured to receive at least a portion of the lens output light reflected from the tissue and to generate an output signal having a signal-

> to-noise ratio, wherein the detection system is configured to be synchronized to the light source, wherein the detection system comprises a plurality of detectors that are spatially separated from each other, and wherein at least one analog to digital converter is coupled to at least one of the plurality of detectors.

’475 patent, col. 85, ll. 11–18 (claim 1).

Citing the Federal Circuit’s decision in *Becton, Dickinson & Co. v. Tyco Healthcare Group*, 616 F.3d 1249 (Fed. Cir. 2010), WHOOP argues that the recitation of several discrete components of the claimed “apparatus adapted to be worn by a user” raises a presumption that the claim elements “require separate, structural components.” D.I. 114 at 15. WHOOP points out that in Omni’s POPR in the Samsung IPR proceeding, Omni acknowledged that the biosensors, the light source, and the detection system recited in claim 1 of the ’475 patent are separate components. In particular, Omni asserted that claim 1 “recites the following as separate and distinct claim elements: ‘one or more biosensors ([1.a]); ‘a light source’ ([1.d]) and ‘a detection system’ ([1.f]).” D.I. 116-10, Exhibit 10, at 14. WHOOP also notes that Omni emphasized that the Abstract of the ’475 patent referred to a wearable device “comprising one more biosensors, as well as . . . a light source . . . and a detection device, by italicizing the phrase “as well as” immediately following the reference to biosensors. D.I. 114 at 15.

Based on the patent’s characterization of the biosensors, light source, and detection system as separate elements of the invention, WHOOP argues that a person of ordinary skill in the art “would not have understood with reasonable certainty” what a biosensor is, or how a biosensor is different from the light source and light detection system.” *Id.* at 16. In view of the treatment of the biosensor, the light source, and the detection system as separate components, WHOOP argues that the definition of a biosensor “cannot refer to either or both of the light source and the detection

system, and because the specification provides no additional guidance as to how to understand the definition of a 'biosensor,' it is indefinite." *Id.* at 17.

Omni responds that the term "biosensor" has an "established meaning as a 'device that senses information about the biological characteristics of a subject.'" D.I. 122 at 15 (quoting Omni's expert, Dr. Igor Efimov, D.I. 123-7 at ¶ 46 (Exhibit 7)). In addition to testimony from Dr. Efimov, Omni relies on a number of dictionaries to support its contention that the term "biosensor" is not indefinite. *See* D.I. 123-4 through 123-6 (Exhibits 4 through 6). WHOOP counters that Omni's definitional evidence was not offered in a timely manner. Omni's evidence, however, was offered in connection with Omni's Answering Claim Construction Brief, which was a timely response to WHOOP's arguments in its Opening Claim Construction Brief.

With remarkable consistency, the dictionaries cited by Omni, including both general-purpose dictionaries and medical dictionaries, define the term "biosensor" as a device that senses information about the biological characteristics of a patient. *See* D.I. 122-4 (Exhibit 4) (defining a biosensor as "a device that is sensitive to a physical or chemical stimulus (as heat or an ion) and transmits information about a life process"); D.I. 122-5 (Exhibit 5) (defining a biosensor as "a device that senses and transmits information about a biological process, as blood pressure, of an individual under observation"); D.I 122-6 (Exhibit 6) (defining a biosensor as "a device that detects, records, and transmits information regarding a physiological change or process"; "a sensor which collects data on a biologic or physiologic process—e.g., blood pressure, temperature, etc."; and "a biological material such as an enzyme, an antibody, a microorganism or other biological system, coupled to an appropriate transducing system, which act together to monitor a specific biochemical reaction and convert it into a measurable electrical signal."). The dictionary definitions and the testimony of Omni's expert indicate that the term "biosensor" has a broad, but

definite, meaning. The record thus supports Omni's contention that a person of ordinary skill in the art with an engineering degree and some experience in the field would understand the ordinary meaning of the term. The term by itself is not indefinite.

In response to WHOOP's argument based on the *Becton Dickinson* case, Omni argues that "WHOOP does not establish or explain why a POSITA supposedly could not determine the scope of claim 1 with the understanding that the claim requires both a light source/detection system and one or more separate biosensors. A POSITA would have no difficulty understanding these requirements or determining whether any accused apparatus satisfies them." D.I. 122 at 16. In its Sur-Reply Claim Construction Brief, Omni adds that

> As a POSITA would readily understand, apparatuses falling within the claim must include light source and detection system components that function as claimed, *as well as* a separate biosensor. Nothing prevents the biosensor from having its own light detector. Or, the biosensor may be of a type that does not detect light, such as an accelerometer or skin temperature sensor, as in the WHOOP device.

D.I. 129 at 6. Omni thus concedes that while the term "biosensor" refers to a device that senses information about the biological characteristics of a subject, the biosensor claimed in the '475 patent must be separate from the light source and the detection system that are recited in claim 1 of that patent. In accordance with that concession, I construe the term "biosensors," as used in claim 1 of the '475 patent, to mean a device that senses information about the biological characteristics of a subject and is separate from the light source and the detection system recited in that claim.

### B. The Mixture of Structural and Functional Features

WHOOP next argues that the "biosensor" limitation improperly mixes structural and functional elements, leaving competitors unsure of the scope of the '475 patent. WHOOP argues that the "biosensor" limitation does not make clear whether it is directed to a device that is capable

of conducting measurements or whether it is directed to the act of measuring, such that the act of measuring is the infringing act. Omni counters that the use of functional language in the '475 patent is permissible under *Ultimate Pointer, L.L.C. v Nintendo Co., Ltd.*, where the Federal Circuit held that "[i]f an apparatus claim is clearly limited to an apparatus possessing the recited structure and *capable* of performing the recited functions, then the claim is not invalid as indefinite." 816 F.3d 816, 826 (Fed. Cir. 2016) (cleaned up). The court in *Ultimate Pointer* held that the claim in that case was not indefinite, as it was directed to "an apparatus with particular capabilities" rather than "both an apparatus and a method." *Id*.

While claim 1 of the '475 patent is not drafted with ideal precision, it is reasonably clear that the claim is directed to biosensors that are adapted "to be placed on the user" and to measure one or more different physiological parameters, comprising pulse rate monitoring and blood flow measurement. Unlike in cases such as *IPXL Holdings, L.L.C. v Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005), and *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303 (Fed. Cir. 2011), cited by WHOOP, claim 1 of the '475 patent does not clearly contain both structural and functional limitations. The claim at issue in *IPXL* was directed to an electronic fund transaction system, but the claim also contained a limitation requiring that "the user uses the input means to change the predicted transaction information or accept the displayed transaction type and transaction parameters," which was clearly functional in nature. 430 F.3d at 1383–84. And in *Katz*, the claims at issue were directed to a system for providing automated messages, but the claims also required that the individual callers "digitally enter data," which introduced ambiguity as to the reach of the claims. 639 F.3d at 1318.

The claims of the '475 patent are not subject to the same uncertainty. The contested portion of claim 1 of the '475 patent is best understood to recite the following: An apparatus to be worn

by a user comprising (1) one or more biosensors adapted to be placed on the user, such that certain physiological parameters can be measured, one or more of which is measured by a differential measurement, and one of more of which consists of pulse rate monitoring and blood flow measurement; (2) a light source configured to generate optical light; (3) one or more lenses configured to receive light from the light source and direct it to the patient's tissue; and (4) a detection system configured to receive at least a portion of the light output from the lens. That interpretation of the claim language is consistent with the specification of the '475 patent, which describes the detection system as being "configured to measure the one or more physiological parameters when worn by the user." '475 patent, col. 9, ll. 55–57. As so construed, the contested portion of claim 1 of the '475 patent is directed entirely to structure that is configured to perform particular functions. In that respect, this case is similar to a number of cases in which the Federal Circuit has held that claims using both structural and functional language are not indefinite if the functional language refers to the capability of the claimed structure, and the claims in question "do not recite functionality divorced from the cited structure," i.e., they "do not reflect an attempt to claim both an apparatus and a method." *Ultimate Pointer*, 816 F.3d at 827–28; *see also, e.g.*, *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1312–16 (Fed. Cir. 2017); *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1277–78 (Fed. Cir. 2012); *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374–75 (Fed. Cir. 2008). Claim 1 of the '475 patent and its dependent claims are therefore not indefinite on the ground that they contain both structural and functional limitations.

## III. Conclusion

For the reasons discussed, I construe the disputed terms in the ’868 and ’455 patents to have the meanings provided above. I find the term “biosensors” in the ’475 patent not to be indefinite, and I construe that term as indicated above.

IT IS SO ORDERED.

SIGNED this 2d day of November, 2026.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE